# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

## PRO SE PRISONER CIVIL RIGHTS COMPLAINT

SCANNED at
and Emailed
3/18/22 by SM . 252 pages
    date        initials    No.

CASE NO. _____

**PLAINTIFF(S)** [Write the name(s) of the person(s) complaining. Do not use **et al.**]

Anthony Azukas

_____

_____

_____

_____

vs.

**DEFENDANT(S)** [Write the name(s) of the person(s) you are suing.  If you do not know a name, write "John Doe" or "Jane Doe."  Include the defendant's rank or title if you know it. Do not use **et al.**]

Commissioner Scott Semple

Warden Scott Erfe

Unit Manager Danby

Doctor Ricardo Ruiz

APRN Kristen Donohue-Gonzalez

RN Shadane M. Harris

Complete every section and **SIGN THE LAST PAGE.**

*Revised 12/13/18*

## A. JURISDICTION

Because federal courts cannot hear every kind of claim, you must identify the law that says this court can hear your claim.  There are two possibilities.  Check one.

I can bring my complaint in federal court because I am suing:

1. _____✓_____ State, county or city employees for violating my federal rights under 42 U.S.C. Sec. 1983/1985/1986; OR

2. _____ Federal employees for violating my federal rights under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) and 28 U.S.C. Sec. 1331.

## B. PLAINTIFF (THE PERSON FILING THIS COMPLAINT)

If there is more than one plaintiff, attach additional pages.  Provide items a, b, and c for each plaintiff.

1. First Plaintiff
   a. Full Name: Anthony Daniel Azukas

   b. Inmate Number: 281876

   c. Correctional facility: Cheshire C.I.

## C. DEFENDANT (THE PERSON WHOSE ACTIONS YOU ARE COMPLAINING ABOUT)

If you are suing more than six defendants, attach additional pages.  Provide items a, b, and c for each defendant.

1. First Defendant
   a. Full Name: Scott Semple

   b. Rank or Title: Commissioner (retired)

   c. Workplace: 24 Wolcott Hill Rd., Wethersfield, CT 06109

*Revised 12/13/18*

2. Second Defendant
   a.  Full Name:  Scott Erfe
   b.  Rank or Title:  Warden (retired)
   c.  Workplace:  Cheshire C.I., 900 Highland Ave., Cheshire, CT 06410

3. Third Defendant
   a.  Full Name:  Defendant Danby
   b.  Rank or Title:  Unit Manager (retired)
   c.  Workplace:  Cheshire C.I., 900 Highland Ave., Cheshire, CT 06410

4. Fourth Defendant
   a.  Full Name:  Ricardo Ruiz
   b.  Rank or Title:  Doctor
   c.  Workplace:  Cheshire C.I., 900 Highland Ave., Cheshire, CT 06410

5. Fifth Defendant
   a.  Full Name:  Kristen Donohue - Gonzalez
   b.  Rank or Title:  APRN (Nurse Practitioner)
   c.  Workplace:  Cheshire C.I., 900 Highland Ave., Cheshire, CT 06410

6. Sixth Defendant
   a.  Full Name:  Shadane M. Harris
   b.  Rank or Title:  Nurse
   c.  Workplace:  Cheshire C.I., 900 Highland Ave., Cheshire, CT 06410

## D. REASON FOR COMPLAINT

**WARNING: Contact Inmate Legal Aid Program. Common mistakes can get your case dismissed as frivolous or for failure to state a good legal claim.** If this happens, you will still have to pay the filing fee, even if you are proceeding in forma pauperis. To avoid losing your filing fee, please read this information carefully and consult Inmate Legal Aid Program before you file.

*Revised 12/13/18*

1. Failure to use the prison grievance process before suing. If you have not followed all the steps in the grievance process before you come to court, the defendants may ask the Court to dismiss your claims for "failure to exhaust administrative remedies."

2. Complaining about incidents that happened a long time ago: If you are suing about events that happened more than three years ago, the defendants may ask the Court to dismiss your case under the "statute of limitations."

3. Suing people who were not personally involved: You can generally only sue defendants who were directly involved in harming you. In order to sue a supervisor, you must usually show that the supervisor knew about the actions of other defendants and failed to stop them.

4. Suing defendants who have immunity to suit for money damages: You generally cannot sue the following people and entities for money damages: the State of Connecticut; agencies of the state (like the Department of Correction); the United States government; the President of the United States (for actions taken while President); judges (for actions taken in connection with judicial duties); parole board officers (for actions taken in imposing parole conditions or revoking parole); prosecutors (for actions taken in performing duties integral to the criminal judicial process). If you think you have a claim for money damages against such people or entities, check with Inmate Legal Aid Program first. If you name defendants who are immune to suit from money damages and your suit is dismissed on that basis, you will lose your filing fee.

5. Complaining about a criminal conviction or prison disciplinary proceeding that resulted in loss of good time credits or other change to your time in prison. If winning your claims "would necessarily imply the invalidity" of a criminal conviction or prison disciplinary punishment affecting the time served, then you cannot make these claims under Section 1983 unless you have already had the conviction or prison disciplinary proceeding invalidated, for example through a habeas proceeding. See *Heck v. Humphrey*, 512 U.S. 477, 487 (1994).

Please note that this is not a complete list of the problems you might encounter with your case. The Court cannot give you legal advice and will not appoint a lawyer for you until it is clear that you have a good legal claim. Until then, your best strategy is to call the Inmate Legal Aid Program before you file a complaint. If Inmate Legal Aid Program says you do not have a good case, you should consider that advice very seriously.

Now you need to explain how your federal rights were violated (remember that not every violation of state law or prison regulations amounts to a violation of federal law). What you need to tell the Court is who did what, when they did it, and how you were harmed.

*Revised 12/13/18*

4

You do not need to cite to the Constitution, any statutes, or any cases. However, it is important to be specific about dates, times, and the names of the people involved. It is helpful to put each important fact in a separate, numbered paragraph.

If you do not know the name of the person who harmed you, call that person Defendant Doe and provide some information from which it will be possible to identify the person - for example, gender, rank and shift. If there is more than one defendant whose name you do not know, call them Defendant Doe1, Defendant Doe2, and so on.

Here is an example of the proper way to describe your claims:

Example of Statement of Case
1. On April 12, 2015, I fell and injured my foot during a basketball game with other prisoners.
2. After the game, I asked Defendant CO Brian Smith to let me see the nurse. Defendant CO Brian Smith told me that I could not see the nurse because it was not an emergency.
3. During the afternoon, my foot became swollen and very painful.
4. At about 5 p.m., in the presence of my cellmate Bill Bloggs, I told Defendant Lieutenant Jane Doe, who was the shift supervisor, that I needed a doctor and showed her my swollen foot.
5. Defendant Lieutenant Jane Doe brought me two Tylenol and told me that I could not see the nurse until sick call the next morning.
6. The next day, I could not get out of bed because my foot was so swollen and painful. I had to go to hospital and have an operation to fix my foot.
7. I had to take pain medication for two months after the operation and have needed a walking stick for support since that time.
Now describe your claims.

Statement of Case



1.

2.

3.

4.

*Revised 12/13/18*

5.

6.

7.



*See attachment pages*

8.

9.

10.

If you need more space, attach additional pages, but be as brief as possible.

## E.     REQUEST FOR RELIEF

Tell the court what kind of relief you want.  **Remember**: (1) You can only get money damages for mental or emotional injury if you were also physically injured; (2) Money damages may be reduced to pay restitution to victims of your crime and fees for a courtappointed attorney, if you had one; (3) You cannot use a Section 1983 or *Bivens* action to request release from custody, a reduction in your sentence, or a restoration of good time credits.  For any of these, you must request a Writ of Habeas Corpus.

*Revised 12/13/18*

F.    DO YOU WISH TO HAVE A JURY TRIAL?  YES __✓__  NO____

G.    DECLARATION UNDER PENALTY OF PERJURY

Warning: You must sign this or your complaint will not be filed.

By signing this complaint, I certify under penalty of perjury that the information contained in this complaint is true and accurate to the best of my knowledge.  I understand that if I lie in this complaint, I may be prosecuted for perjury, and punished with as much as five (5) years in prison and/or a fine of $250,000.  See 18 U.S.C. Sections 1621, 3571.

Signature: _Anthony Angelas_

Signed at __Cheshire C.I._____ on _3-18-22_____
            (Location)                        (Date)

If there are additional plaintiffs, attach another page with the name and signature of each plaintiff on it.  **The complaint cannot be filed without a signature from each plaintiff.**

H.    FINAL INSTRUCTIONS

WARNING: Your complaint will not be filed unless you complete each of these steps:

    1.    Answer all questions on the complaint form.

    2.    Sign the Declaration under Penalty of Perjury on p. 7

Remember, the Clerk cannot file your complaint unless you take all of the steps above.

*Revised 12/13/18*

7

CHECKLIST FOR IFP APPLICATION

NOTE:        Before you send this application to the Court you MUST:

____√____    Sign the Declaration under Penalty of Perjury on p. 3

____√____    Sign the Prisoner Authorization on p. 4

____√____    Show the application to the Inmate Trust Fund Department or your prison
             counselor and have them sign p. 5

____√____    Answer every question truthfully and accurately

____√____    Attach trust fund statement for the last six (6) months (ledger sheet)

When the Inmate Trust Fund Department or your counselor has signed page 5, attach this
form to your complaint and submit to the Court.

D. REASON FOR COMPLAINT – Attachment Pages

## Statement of Facts

1.)     The plaintiff, Anthony Azukas, was incarcerated at Cheshire Correctional Institution in Cheshire, Connecticut during the events described in this complaint.

2.)     In accordance with Connecticut General Statutes (C.G.S.), vol. 6, sec. 18-81, the Commissioner of Correction shall be responsible for the overall supervision and direction of all institutions, facilities and activities of the department.
        Also, the commissioner shall be responsible for establishing diagnostic and treatment services throughout the department. (Ex. R, p 1)

3.)     In accordance with Connecticut General Statutes, vol. 6, sec. 18-7, the Warden shall provide for the prisoners suitable relief for any sick or infirm prisoner.
        Also, the warden, when requested, shall communicate to the commissioner any information in his knowledge respecting the prison. (Ex.R, pp. 2-3)

4.)     Upon information and belief, Connecticut Department of Corrections (C.D.O.C.) managed health care policy states that all non-physician staff, such as nurses, physician's assistants and medical technical assistants shall have adequate supervision from a licensed medical doctor, at all times, while performing tasks that are beyond their training and licensing.

5.)     On March 19, 2019, the plaintiff slipped and fell on the tiled

floor outside of the downstairs showers in South Block 5, at Cheshire C.I.   Other inmates witnessed the fall. (Ex. II, p. 2, paragraph #2)

6.)      The plaintiff hit the floor hard, striking the back, left side of his head. The impact did not cause any laceration and the plaintiff believes that he did not lose consciousness. (Exhibit E, p.1, "General Note")

7.)      There were no rubber shower mats on the floor outside of the showers where the plaintiff fell. (Ex. II, p. 2, paragraph #4)

8.)      At that moment, except for being wet and a little shook up, the plaintiff felt ok. He went to his cell and changed clothes and went on with the day. (Ex. HH, p. 1, paragraph #2)

9.)      It is common knowledge within the medical profession that symptoms of an actual injury sometimes do not appear right away with a head injury. In fact, it can take anywhere between a couple of hours up to several weeks before any symptoms of serious injury appear. This is why any head injury should be considered serious and should be evaluated by trained medical professionals right away. (Ex. J, p.5, "Head Injury, Adult") (Ex. CC, p. 3, "Head Injuries") and (Ex. DD, p.5, bottom portion of page)

10)      A couple of hours after the initial fall is when the plaintiff started to notice that he was injured. His cellmate had exited the cell because the doors popped for chow. When the plaintiff tried to get up to go eat his legs

2

went numb and as he was falling back onto his bunk he tried to reach out with his right arm, his arm would not work either. At the same time, he was having difficulty breathing, as it felt like he was being chocked. It was a squeezing feeling throughout his whole neck and it caused a headache and he could hear his heart beating in his ears. Then, all of a sudden, everything but the headache went away just as fast as it came about.

11.)     The plaintiff was experiencing "classic" symptoms of a serious head injury, signaling that an examination, possibly using diagnostic tools such as a CT Scan or M.R.I., should be conducted. (Ex. J, pp. 7-8, "What are signs or symptoms?") (Ex. DD, p. 5, "What are symptoms of subdural hematoma")

12.)     Once the nurse entered South Block 5 to distribute nighttime medication, the plaintiff immediately alerted proper medical staff about his fall earlier that day and the delayed symptoms described in paragraph #10 above. (Ex. II, p. 1, 2nd paragraph) The nurse was defendant Harris.

13.)     It is standard procedure to perform a physical and neurological exam with a reported head injury showing "classic" symptoms of a possible more serious injury. (Ex. J, p. 8, "How is this diagnosed?") (Ex. DD, p. 6, "Diagnosis and Tests")

14.)     When the plaintiff verbally reported his medical emergency to defendant Harris, the correctional officer (C.O.) that was with her made

a slighted remark, "Well, your legs appear to be working good now!" This comment quickly caused the plaintiff and several other inmates to become bothered. (Ex. II, p. 1, 2nd paragraph)

15.)    Defendant Harris told the plaintiff that there was nothing she could do for him, due to the fact that there was not a doctor on duty, that they were short of staff and she was busy delivering nighttime medication throughout the South side of the prison. She instructed the plaintiff to write everything down on a request and drop it in the "sick call" box and medical would see him tomorrow. (Ex. II, p. 1, 3rd paragraph)

16.)    Within minutes, the plaintiff did as instructed and wrote down his emergency with his concern that he "may have damaged something vital" and asking to see the doctor. (Ex. A, in its entirety)

17.)    The plaintiff tried to hand the request directly to defendant Harris, but she would not take it. Defendant Harris said it was against policy. It had to be put in the box, that way no one could get blamed for a "missing" request. (Ex. HH, p. 1, 3rd paragraph) The plaintiff dropped it in the "sick call" box.

18.)    It is important to mention that Cheshire C.I. does not have the proper diagnostic tools (CT scan, M.R.I.) in their facility. They only have an x-ray machine, which is not a proper tool used to define what is or is not a serious head injury. (Ex. J, p. 8, "How is it Diagnosed")

4

19.)    When confronted with the plaintiff's reported fall and head injury coupled with the delayed, "classic" symptoms of a serious injury, defendant failed to follow proper procedure by not performing physical and neurological tests.

20.)    Upon information and belief, due to there being no doctor on duty, defendant Harris assumed the role as "gate keeper". She could have sent the plaintiff to an outside facility (U Conn Medical) where there was adequate, qualified medical staff and diagnostic tools, but she failed to do so, which blocked the plaintiff's access to proper treatment.

21)    In the "gate keeper" role, defendant Harris performed tasks that she was unqualified to perform, and was doing so without adequate supervision. She decided not to treat the plaintiff and made the decision not to send him to an outside facility for treatment. Instead, she decided on the path of least resistance and instructed the plaintiff to just "drop a request in the 'sick call' box".

22)    Upon information and belief, the supervising physician is responsible for making sure there is adequate medical staffing to assure that the overall system is functioning properly to meet the health needs of that prison's inmate population. Defendant Ruiz failed to assure that there was adequate medical staffing available to properly treat the plaintiff's medical emergency, which violated policy.

23.)    Defendant Ruiz is the supervising physician at Cheshire C.I. Therefore, defendant Ruiz failed to adequately supervise his non-physician medical staff members, such as defendant Harris, which violated policy.

24.) The following day, March 20, 2019, the plaintiff returned to his cell from college with a massive headache. He tried to speak with a nurse in the hallway when he was returning from school, but was told to, again, write. (Ex. HH, p. 1, paragraph #4)

25.) It is a fact that the plaintiff was never called down to the medical department the next day, which would have been March 20, 2019.

26.) Upon information and belief, defendant Harris is the staff member that processed and logged in the plaintiff's "sick call" request on March 23, 2019. (Ex. A, bottom right, stamp that states "MAR 23 2019") This solidifies the statement made above in paragraph 25.

Also, this is the second (2nd) time, in four days, that defendant Harris has been alerted to the plaintiff's fall and head injury with delayed symptoms of it being serious. The plaintiff was not called to medical, treated or tested properly, or sent to an outside facility to receive proper treatment.

27.) From March 21, 2019 through April 2, 2019, the plaintiff's physical and mental capacities progressively deteriorated. In the last four or five days, other inmates practically had to carry him, so that he could move around the block. (Ex. II, p. 1, 4th paragraph) (Ex. II, p. 2, paragraph #4) (Ex. II, p. 3, 2nd paragraph) and (Ex. II, p. 4, 2nd paragraph)

28.) The plaintiff tried to get nurses to help him at morning medication. (Ex. HH, paragraph #5) Other inmates also tried to get both custody and

medical staff to help the plaintiff, but to no avail. (Ex.II, p. 2, paragraphs #4 #5)

29.)      Many staff members, custody and medical alike, kept asking if the plaintiff wrote to medical. When they were told "Yes!" the response was always "Be patient". Medical staff would claim they were "short of staff" on the regular. (Ex.HH, p.1, paragraph #5)(Ex.II, p.1, paragraph 3) and (Ex.II, p.2, paragraph #4)

30.)      On April 2, 2019, the plaintiff's cellmate finally had two C.O.'s working in South Block 5, second shift, that listened to what he had to say. C.O. Ferrerra and C.O. Steiner investigated the situation and made the plaintiff physically come out of his cell to check him. Both officers recognized instantly that the plaintiff needed medical attention. (Ex.HH, p.1, paragraph #6)

31.)      Upon information and belief, C.O. Steiner called medical and conveyed the information that the plaintiff's cellmate provided about him not eating and sleeping excessively, while getting up to vomit periodically, even though he hadn't eaten.  It was approximately 8:15 p.m. when C.O. Steiner convinced medical to see the plaintiff.

32)      At approximately 8:25 p.m., on April 2, 2019, due to a C.O.'s persistence, the plaintiff was sent to medical. The defendant, Nurse Harris, was the only staff member at medical. She informed the plaintiff that she would do an exam because there was no doctor on duty. See exhibit B, p.3, "Teaching Completed" — it states F/u (follow up) with MD/APRN requested. A request for a follow up would

7

not have been made for a doctor or APRN if one had been there at that moment, because they would have been in that examination room, because Cheshire C.I. only has that one examination room.

33.) Defendant Harris is now being alerted to the plaintiff's fall and head injury accompanied with not only "classic" symptoms of serious injury, but also signs of a life-threatening head injury. (Ex.CC, p.4, signs and symptoms of a life-threatening head injury) The plaintiff was already experiencing all of the signs of concussion. Now, he was sleeping all day and night, vomiting and could not remember the day or month he was in. This was the third time in fourteen days that defendant Harris is confronted with this medical emergency. (see paragraphs #12 and #26, above)

34.) Defendant Harris performed a partial physical and determined that the plaintiff had constant neck/headache, loosing track of time, overall demeanor noted as odd and "flat" affect. (Ex.B, p.3, "Narrative Notes)

35.) At this point, during the examination referenced in paragraph 34, above, defendant Harris had the written request to "sick call" right there in her hand, as she evaluated the plaintiff's demeanor as "odd". (see Exhibit A, at the bottom) Defendant Harris signs and dates the request "4/2/19 Seen in sick-call". This one document actually has ALL THREE dates on it, in which defendant Harris was alerted to the same medical emergency within that fourteen day period. Couple all of this with the fact that defendant Harris just received more

information about the plaintiff's two week deterioration from other inmates and staff, alike, from C.O. Steiner over the telephone, as discussed in paragraph 31 above, and this is more than enough information needed to conclude that the plaintiff needs to go to the hospital a.s.a.p. There were inmates voicing this obvious fact for days, and now custody staff was in agreement.

36.) Without adequate supervision, while assuming the role of "gate keeper", with the plaintiff's symptoms being so obvious even the lay person would know that he needed to go to the hospital, defendant Harris decided to take the path of least resistance. She referred the plaintiff to the Mental Health Department, due to a "Flat" affect, gave him some Motrin and sent him back to his cell. (Ex. A, bottom of page — Motrin) (Ex. B, p. 4)

37.) It is important to mention that Motrin actually "encourages bleeding", which in the plaintiff's situation did more harm than good. (Ex. I, p.4, medications)

38.) On April 3, 2019, the plaintiff was called down to the Mental Health Department. The plaintiff was evaluated by Social Worker (S.W.) Lisa Simo-Kinzer. SW Lisa almost immediately knew that the plaintiff's issues were "more medically based than psychiatric". (Ex.C, p.2, plan)

39.) C.O. Steiner happened to be working first shift, so S.W. Lisa was able to speak with him on the phone about everything. (Ex.C, p.1, Assessment Notes)

9

40.)     S.W. Lisa discussed her findings with the head doctor in the Mental Health Department, Dr. Cartwright. Dr. Cartwright decided to personally take the plaintiff back over to medical and discuss her and S.W. Lisa's findings with the APRN/MD. (Ex.C, p.2, plan)

41.)     Upon arriving at the medical department, Dr. Cartwright and the plaintiff encountered the APRN, defendant Donohue-Gonzalez. She informed us that she was the only one there today.

42.)     Dr. Cartwright informed defendant Donohue-Gonzalez of the entire situation, from start to finish, with the help of the plaintiff.

43.)     With Dr. Cartwright present, defendant Donohue-Gonzalez performed a full physical and neurological exam. Her primary assessment was "concussion with a bad headache" and the secondary assessment was "loss of time." Defendant Donohue-Gonzalez did state that the plaintiff needed a CT scan and said she would try and request one. (Ex. D, p.2, Primary, Secondary, Plan)

44.)     Defendant Donohue-Gonzalez's response was the complete opposite of defendant Harris' response when they were alerted to the plaintiff head injury, but ultimately ended in the same manner. The plaintiff was sent back to his cell with some Motrin, again.

45.)     Defendant Donohue-Gonzalez also assumed the role of "gate keeper". She failed to send the plaintiff out of the facility to receive proper diagnostic

testing and medical treatment, which caused the unnecessary delay and causing the plaintiff to suffer irrepairable harm, physically and mentally.

46.)    Defendant Donohue-Gonzalez was performing tasks that she was unqualified and not licensed to perform and did so without adequate supervision, causing a delay in proper diagnostic testing and treatment, which caused the plaintiff to suffer irrepairable harm physically and mentally.

47.)    Defendant Semple, who was the Commissioner at this time, was responsible for direction/policy for the entire state. He failed to implement a policy that would ensure there was adequate medical personnel to cover for medical emergencies when there is not a doctor on duty, causing delays in treatment.

48.)    Upon information and belief, defendant Semple failed to maintain an adequate amount of medical personnel to ensure the entire medical system is effective in adequately treating the entire inmate population and is capable of handling emergencies.

49.)    Upon information and belief, defendant Semple openly admitted in previous litigation that he and the Clinical Director of Correctional Managed Health Care, Kathleen Maurer are both aware of the ineffectiveness of the entire health care system throughout the whole state of Connecticut.

50.)    Defendant Erfe is responsible for the overall operations of his prison

11

and, therefore, is responsible for ensuring that there is adequate amount of medical personnel to cover medical emergencies effectively when there is no doctor on duty, which he failed to do, causing unnecessary delays in proper diagnostic testing and treatment.

51.)   Defendant Ruiz violated policy when he failed to adequately supervise non-physician staff, such as defendant Donohue-Gonzalez, which caused a delay in the plaintiff receiving proper diagnosis testing and treatment.

52.)   On April 4, 2019, at approximately 2:30 p.m., about a half of an hour before shift change — and when the doctor leaves, Dr. Cartwright came to South Block 5 and had the plaintiff's cell door opened. She asked, "Did medical see you yet?" When the plaintiff told her "No" she became visibly aggravated. She told the plaintiff, "Let's go!" "They're seeing you RIGHT now before they leave!"

53.)   Dr. Cartwright and the plaintiff went to the medical department together and she conveyed all of the information from all of the previous days to the doctor, defendant Ruiz. She left the plaintiff with Dr. Ruiz.

54.)   Defendant Ruiz performed another neurological test and just like the two previous tests that he took in the last two days, he failed on half of the tasks (Ex. E, p. 2) Do to the totality of all the information he received and the plaintiff failing most of the neuro test, defendant Ruiz decides to send the plaintiff on an emergency trip to UConn Health Emergency

Department for a CT Scan. (Ex.E, p.3)

55.)    On April 4, 2019, at approximately 7:00 p.m., the plaintiff finally receives a CT Scan.

56.)    Approximately 30 minutes later, there was a "full code" being called over the hospital's intercom system and it was directed to the Emergency Department. Within moments it became apparent that it was for the plaintiff, due to a dozen people rushing into the room. (Ex.G, mid page - "full code")

57.)    The plaintiff was informed that the situation was serious and that he was in grave danger. The CT Scan showed an Acute/Subacute large left subdural hematoma (brain bleed) with a left uncal herniation and slight displacement of the brain stem with enlargement of the right lateral ventricle. (Ex.F, CT results) (Ex.DD, p.4, Are there different types of Subdural Hematomas) (Ex.DD, p.7, brain herniation)

58.)    On April 4, 2019, the plaintiff was admitted into I.C.U. for neurological monitoring with the plan to operate in the morning.

59.)    The plaintiff spoke with the neurosurgeon, Dr. Bulsara, who informed that plaintiff that he would be going in for emergency surgery early in the morning. Dr. Bulsara went on to explain that usually they would only have to drill a burr hole the size of a dime, but for the plaintiff's situation, because so much blood was allowed to pool, they would have to cut a hole the size of the plaintiff's fist.

60.)    On April 5, 2019, the plaintiff had major brain surgery (craniotomy). Afterward, the plaintiff spent 3 days in I.C.U., then 2 days in the Intermediate and the last 4 days in a regular room before he was transferred to MacDougall C.I. Infirmary.

61.)    Due to having to receive a larger hole in the skull, the plaintiff had sixty-five (65) staples in his head, which left a horseshoe shaped and size scar on the left side of his head. (Ex. P, pp. 1 and 2)

62.)    Twelve days after being transferred to MacDougall Infirmary, the plaintiff was transferred to Osborne C.I.'s hospital, and would stay there until he was ready to go back into general population, which was August 1, 2019.

63.)    When the plaintiff started to try and put everything together and start the grievance process on everything that happened, it became apparent very quickly that he was no longer able to read, write or concentrate as he once was able to do. Several of the inmate Certified Nurses Assistants (C.N.A.) volunteered to assist the plaintiff as much as they could.

64.)    On April 27, 2019, the plaintiff filed an Inmate Administrative Remedy Form grieving the issue of no shower mats outside of the showers in South Block 5. It was mailed by one of the C.N.A.'s (Ex. K, pp. 1-4)

65.)    On May 8, 2019, the "grievance was returned without disposition,"

14

by Administrative Remedies Coordinator (ARC) Green. He stated that the grievance had to be put in Osborne's grievance box and cannot be mailed. (Ex. K, p. 5, comment)

66.) On May 24, 2019, the plaintiff wrote to ARC Green asking for him to direct the plaintiff to where the rule of "no mailing" was located, at the same time the plaintiff also rewrote the grievance and had one of the CNA's drop it in Osborne's grievance box. (Ex. L, p.1) and (Ex. L, pp. 2 and 3)

67.) On July 11, 2019, ARC Green denied the plaintiff's grievance referenced above in paragraph 66, for being untimely. (Ex. L, p. 3, bottom) ARC Green never did answer the letter.

68. On July 31, 2019, the plaintiff filed an Inmate Grievance Appeal Form - Level 2. The plaintiff explained his situation and submitted documents about special circumstances. But the plaintiff believed, and still does believe that this timeframe does not even matter for two (2) separate, but very valid reasons:

A.) On the CN 9606, Grievance Returned Without Disposition form does not stipulate a timeframe for REFILING the non compliant grievance that was "Returned Without Disposition". The bottom of this form simply states "You may resubmit your grievance when it is in compliance with A.D. 9.6." The plaintiff rewrote the grievance and dropped it in the box the same day he received the return. (Ex. K, p. 5, bottom)

15

B.) April 24, 2019, was the first chance the plaintiff had to touch his property since April 4, 2019 when he was admitted. It was only then that the plaintiff found what is now called Exhibit A. Now everyone knew that it was definitely a sixteen day delay and not a week. The plaintiff could not remember exactly when he fell and no one else knew either, so this told us the exact date. And in my appeal, the reviewer agreed about "actual knowledge" and stated that first grievance was dated 4/27/19, so the plaintiff's "actual knowledge" at least starts there. The new grievance was dated 5/24/19 — thirty (30) days or less from actual knowledge. But the appeal was rejected, stating the grievance is dated 5/24/19, but it wasn't received until 5/31/19. (Ex. M, p.1, disposition)

The plaintiff cannot be responsible for the ARC not emptying the box, or not processing the grievances timely. May 24, 2019, was a friday. That was Memorial Day weekend. That box probably wasn't emptied until, at least, May 28. Also, if you read the first sentence from the plaintiff on that appeal, he's letting the reviewer know that it took him eighteen (18) days to receive the rejection of the level 1 grievance. That's 18 days after it was emailed to Osborne's ARC. (Ex. M, p.1, first sentence) The plaintiff claims "Prisoner's Mailbox Rule."

69.)    The plaintiff exhausted his administrative remedies pertaining to no shower mats. (Ex. M, p.1, X in the box)

70.)    Upon information and belief, C.D.O.C. is liable for an injury suffered by an inmate if the cause of the injury could have been reasonably foreseen

and C.D.O.C. failed in its duty to prevent it. In Connecticut, inmates are considered "invitees" for purposes of determining the duty of care owed by prison officials.

71.)    In 2016, inmate James Davenport slipped and fell in North Block 5 showers. There were no mats outside of the showers. (Ex. GG, p.1, paragraph #2)

72.)    As soon as Davenport started the grievance process, Unit Manager Harlow discussed the situation with the DW's (Deputy Wardens), Warden & Maintenance. (Ex. GG, p.3, bottom)  The Warden is defendant Erfe.

73.)    Davenport filed a civil suit that was settled in 2020. This was an active issue for approximately four (4) years. (Ex. GG, p.1, paragraph #6)

74.)    In early 2019, several weeks prior to the plaintiff's fall, inmate Robert Swain slipped and fell in the South Block 5, downstairs showers, due to no shower mats outside the showers. This was in the same area that the plaintiff slipped and fell. (Ex. II, p.2, paragraph 3)

75.)    Swain verbally and in writing alerted the Unit Manager about the no mats issue and how he had been injured. Swain's complaints never received results. The Unit Manager was defendant Danby. (Ex. II, p.2, paragraph #3)

76.)    Upon information and belief, the Warden is responsible for the overall safety of their prison. Due to grievance exhaustions, civil actions and Unit

Manager Harlow's response (paragraph 70, above), defendant Erfe was well aware of the unsafe conditions with no shower mats on the floors outside the showers and the injuries that inmates suffered, but chose to let the substatial risk of harm still continue to exist.

77.)    Upon information and belief, Unit Managers are responsible for the overall safety and security of their block. Due to verbal and several written complaints, defendant Danby was well aware of the of the unsafe conditions with no shower mats on the floors outside the showers and the injuries this has caused, but chose to let the substatial risk of harm to remain in existence.

78.)    To date, these unsafe conditions still exist throughout Cheshire C.I., in varying degrees — depending on which block you are in.

79.)    On July 7, 2019, the plaintiff filed three separate Health Services Reviews about Administrative issues. There can be only one (1) issue per grievance. The three (3) separate grievances all stem from one (1) incident. This is why the first two thirds of all three grievances are the same. These were dropped in the box at Osborne C.I. (Ex. N, pp. 3-13)

80.)    The plaintiff also mailed an exact copy to Cheshire C.I. (Ex. N, in its entirety)

81.)    The plaintiff included a cover with both packs of grievances explaining why he filed at both prisons (Ex. N, p 2) (Ex. O, p.2)  The plaintiff also did an

affidavit of mailing. All of the documents were identified, put into two separate envelopes, sealed and dropped in the correct boxes, in the presence of the Notary Public. (Ex. N, p.1) (Ex. O, p.1)

82.)     None of the grievances from either prison were answered. On August 15, 2019, the plaintiff filed an Appeal of Health Services Review, due to nonresponse to all three separate issues. (Ex. O, p.14)

83.)     Due to nonresponse to the Appeal of Health Services Review referenced in paragraph #82, above, on September 9, 2019, the plaintiff filed a 2nd level Appeal of Health Services Review. (Ex. O, p.19, bottom)

84.)     The time allotted for the Administration to respond to the 2nd level Appeal of Health Services Review referenced in paragraph 83, above, came and went and with that the plaintiff considered his remedies exhausted.

85.)     On February 21, 2020, over six (6) months since the final appeal was filed, the plaintiff received a letter from the central office of C.D.O.C. The Program Director of Health and Addiction Services wanted to inform the plaintiff about how she was in possession of all the levels of grievances. Some were logged in, others were not and some were not even date stamped. She stated that the time had expired for a timely response and exhausted the plaintiff's remedies due to C.D.O.C.'s failure to respond in a timely manner. (Ex. O, p.15)

86.)     Program Director Colleen Gallagher offered to still do the investigation at

a level 3, with an extension of time. (Ex. O, p. 15, last sentence)

87.)    The plaintiff still wanted the investigation because of the policies that were still in place and the unsafe conditions still existed. (Ex. O, pp. #16 and #17)

88.)    A grievance can be denied, rejected, compromised or upheld. When a grievance is "Upheld" the application for administrative remedy is granted. (Ex. Q, p. 2, sec. 3. k)

89.)    On March 6, 2020, Program Director Colleen Gallagher "Upheld" the plaintiff's grievances. (Ex. O, p. 19, bottom)

90.)    The plaintiff now has permanent damage to his brain and body, due to the fall with the delay in treatment.

91.)    Because the left side of his head is held together with titanium plates and screws, the doctors at UConn explained the importance of being extra careful and protective of his head now, due to the fact that another bleed or even death is a greater possibility now. The plaintiff now suffers from anxiety due to this fact. (Ex. S, p. 1, subjective)

92.)    The large incision that had to be made caused a great amount of nerve damage throughout the entire left side of the plaintiff's head, face and neck

93.)    The plaintiff has chronic neck and left shoulder pain, due to the impact of the fall, and he has permanent weakness on the entire left side of his body, which causes him to have to use a cane to walk.

94.)    The plaintiff has permanent hypersensitivity to light in both eyes and hypersensitivity to certain sounds in his left ear. The plaintiff now has to wear special tinted glasses and keeps the left ear plugged. (Ex. S, p. 3, subject and objective)

95.)    On August 1, 2019, the plaintiff left the infirmary and requested to be sent back to Cheshire C.I., due to the college being there and he wanted to go back to school.

96.)    Once the plaintiff was back at Cheshire C.I., he came to realize that about 60% of his memory was gone. And after taking just one course as a test, he quickly realized he had big problems. The plaintiff started experiencing bouts of depression. (Ex. T, p. 1, Objective Findings) (Ex. U, p. 1, Objective Findings)

97.)    The plaintiff eventually caught up with his old cellmate. They spoke at length and exchanged memories of his injury and the sixteen days that the plaintiff had to wait. The plaintiff didn't recall being ignored as much as others were saying, so learning about some of it caused a shift in him. (Ex. V, p. 1, objective findings)

98.)    The plaintiff enjoyed going to school, it was a stress reliever for him and

he maintained good grades (Ex. EE, pp. 1-3)  Because of all the unforeseen problems he was experiencing with memory, reading and writing coupled with emotional instability the plaintiff had to drop out of college. (Ex. V, p. 1, subjective)

99.)   Due to a decline in functioning, the plaintiff was referred to the psychiatrist. The traumatic brain injury caused a significant personality change according to the plaintiff's family and others who know him. The plaintiff was experiencing a lot of mental anguish. (Ex. W, p. 4, subjective and objective)  Dr. Lee requested neuro-cognitive screening to try and find the problem areas. (Ex. W, p. 5, plan)

100.)   On January 8, 2020, the plaintiff was given the RBANS assessment test by Dr. Cruz. (Ex. X, p. 1, subjective)    The results of the test showed that the plaintiff has significant impairment in delayed memory and attention. (Ex. Z, p. 1, subjective)

101.)   Cheshire C.I.'s mental health department has attempted to give some form of cognitive therapy to the plaintiff. (Ex. Y, p. 4)

102.)   Upon information and belief, the type of cognitive therapy that is needed to properly treat the plaintiff cannot be offered in C.D.O.C., due to "safety and security" issues. The plaintiff was told this by several medical staff members.

103.)   Due to depression, anxiety and stress, the plaintiff asked to see Dr. Lee again. (Ex. AA, p. 1, subjective and objective)   The plaintiff decided to go on medication for his issues. (Ex. BB, p. 1, subjective)

104.)    Since the plaintiff left the infirmary, he has had issues with every single cellmate, do to all of the problems he has with being both physically and mentally disabled and mental health issues. After months of back and forth with no results from C.D.O.C. on the lower levels, the plaintiff was advised to go through the Americans With Disabilities Coordinator. The plaintiff requested a "single cell status" and a medical mattress. Before anything gets approved, they thoroughly investigate the claims. It took eleven (11) days to get full, complete approval. This application is verified by medical and mental health before the Administration makes a decision. On February 5, 2021 the request for accommodations was approved in its entirety, which verifies all of the plaintiff's injuries. (Ex. FF, p. 1, approved)

Respectfully Submitted,

Anthony Azukas
Anthony Azukas # 281876
Cheshire C.I.
900 Highland Ave.
Cheshire, CT 06410

E. REQUEST FOR RELIEF - Attachment Pages

## Causes of Action

Plaintiff incorporates paragraphs #1 through #104, as though they were stated fully herein.

## Plaintiff Was Subjected To Cruel and Unusual Punishment In Violation of The Eighth Amendment To The Constitution

105)    Defendant Semple violated the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by not implementing policy that ensured adequate coverage for medical emergencies when there is no doctor on duty and by failing to provide adequate medical personnel to ensure that the entire medical system will be effective, which caused an unnecessary delay in proper diagnostic testing and treatment of the plaintiff's serious medical needs, causing irreparable harm, mentally and physically.

106)    Defendant Erfe violated the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by failing to ensure there was adequate medical personnel to effectively respond to emergencies within his prison and, ultimately, causing unnecessary delays in receiving proper diagnostic testing and treatment, which caused the plaintiff to suffer irreparable harm, mentally and physically.

107)    Defendants Erfe and Danby violated the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by not correcting long-

1

standing, unsafe conditions that they were both aware of, which allowed a substatial risk of harm to continue to exist by not addressing the no mats in the showers issues, subsequently, causing the plaintiff to suffer a serious head injury that left him with permanent damage, mentally and physically.

108)    Defendant Ruiz violated the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by failing to ensure there was adequate medical personnel to keep the system in Cheshire C.I. functioning properly and failing to provide a proper "sick call" system that ensured timely treatment and capable of effectively handling emergencies, also failing in his duty to adequately supervise non-physician staff, on two separate ocassions — once with defendant Harris and the other with defendant Donohue-Gonzalez, while they performed tasks they were unqualified and not licensed to perform, which caused an unnecessary delay in receiving proper diagnostic testing and treatment, causing the plaintiff to suffer irrepairable harm, mentally and physically.

109)    Defendants Donohue-Gonzalez and Harris violated the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by performing tasks and making decisions that they were unqualified and not licensed to do and by assuming the role of "gate keeper" and failing to have the plaintiff transported to the hospital, blocked his access to proper diagnostic testing and treatment at the final forty-eight (48) hours of a sixteen (16) day delay, causing the plaintiff to suffer irrepairable harm, mentally and physically.

110)     Defendant Harris violated the plaintiff's Eighth Amendment rights to be free from cruel and unusual punishment when she failed to follow protocol and perform physical and neurological tests on two (2) separate ocassions, once when she was alerted verbally, and then another when she was alerted in writing. Also, when she was responsible for processing the "sick call" requests, she failed to follow protocol for sorting and prioritizing those requests, which subsequently caused an unnecessary delay in the plaintiff receiving proper diagnostic testing and treatment, causing the plaintiff to suffer irrepairable harm, mentally and physically.

E. REQUEST FOR RELIEF – Attachment Pages

## Relief Requested

Plaintiff incorporates paragraphs #1 through #110, as though they were stated fully herein.

The plaintiff requests that this Court grant the following relief:

A. Issue a declaratory judgment, in their official capacities, stating that the plaintiff's Eighth Amendment rights to be free from cruel and unusual punishment were violated when:

 1) Defendant Semple failed to implement a policy that ensured adequate coverage for medical emergencies in the prisons when there is not a doctor on duty, which caused the plaintiff to suffer irrepairable harm, physically and mentally, because of the delay in receiving proper diagnostic testing and treatment.

 2) Defendant Semple failed to provide an adequate amount of medical personnel, which caused the entire medical system to become ineffective, causing the plaintiff to suffer irrepairable harm, physically and mentally, because of the delay in receiving proper diagnostic testing and treatment.

 3) Defendant Erfe failed to provide an adequate amount of medical staff in his prison to ensure an effective medical system to properly treat the inmate population and effectively respond to emergencies, which caused the plaintiff to suffer irrepairable harm, physically and mentally, due to the delay in receiving proper diagnostic testing and treatment.

4

E.

4.) Defendant Erfe was aware of the longstanding, dangerous conditions of no mats on the floors outside of the showers, due to inmates being injured, and failed to correct these unsafe conditions allowing a substantial risk of harm to continue to exist which, subsequently, caused the plaintiff to suffer a serious head injury that left him with permanent damage, physically and mentally.

5.) Defendant Danby was aware of the longstanding, dangerous conditions of no mats on the floors outside of the South Block 5 showers due to verbal and written notification from an inmate that was injured and failed to correct the unsafe conditions allowing a substantial risk of harm to continue to exist which, subsequently, caused the plaintiff to suffer a serious head injury that left him with permanent damage, physically and mentally.

6.) Defendant Ruiz failed in his duty to ensure that there was adequate medical staffing to keep the overall system in Cheshire C.I. functioning proper to meet the health needs of the inmate population, which caused a delay in the plaintiff receiving proper diagnostic testing and treatment causing him to suffer irrepairable harm, physically and mentally.

7.) Defendant Ruiz failed in his duty to provide a "sick call" system that ensured timely access to treatment and that is capable of effectively handling emergencies, which caused an unnecessary delay in the plaintiff receiving proper diagnostic testing and treatment causing him to suffer irrepairable harm, physically and mentally.

8.) Defendant Ruiz failed in his duty to adequately supervise two non-physician staff members, on two separate ocassions, while they performed tasks they were

E.

unqualified and not licensed to perform, which caused an unnecessary delay in the plaintiff receiving proper diagnostic testing and treatment causing him to suffer irrepairable harm, physically and mentally.

9.) Defendant Donohue-Gonzalez was deliberately indifferent to the plaintiffs serious medical needs by performing tasks she was unqualified and not licensed to perform causing an unnecessary delay in the plaintiff receiving proper diagnostic testing and medical treatment, causing him to suffer irreparable harm, physically and mentally.

10.) Defendant Donohue-Gonzalez was deliberately indifferent to the plaintiffs serious medical needs, while assuming the role of "gate keeper," failed to get the plaintiff transported to the hospital, which caused an unnessesary delay in the plaintiff receiving proper diagnostic testing and medical treatment causing him to suffer irrepairable harm, physically and mentally.

11.) Defendant Harris was deliberately indifferent to the plaintiff's serious medical needs by failing to follow standard protocol for a reported head injury by not conducting a physical and neurological test after being verbally alerted to "classic" symptoms of possibly a more serious injury, which caused a delay in the plaintiff receiving proper diagnostic testing and medical treatment, causing him to suffer irreparable harm, physically and mentally.

12.) Defendant Harris was deliberately indifferent to the plaintiff's serious medical needs by failing to follow standard protocol for the same head injury being reported for a second time by not conducting or alerting another staff member to conduct a physical and neurological test after receiving the

E.

plaintiff report in writing, which caused an unnecessary delay in the plaintiff receiving proper diagnostic testing and medical treatment, causing him to suffer irrepairable harm, physically and mentally.

13.) Defendant Harris was deliberately indifferent to the plaintiff's serious medical needs by assuming the role of "gate keeper" and failing to get the plaintiff transported to the hospital, even after being alerted for the third time about the same head injury now accompanied with life-threatening symptoms, which caused an unnecessary delay in the plaintiff receiving proper diagnostic testing and medical treatment, causing him to suffer irrepairable harm, physically and mentally.

14.) Defendant Harris was deliberately indifferent to the plaintiff's serious medical needs by violating proper procedure when sorting and prioritizing "sick call" requests, as she logged them into the computer. She failed to place the plaintiff at the very top of the list to be seen by the doctor right away, nor did she alert any other medical or custody staff members about the seriousness of the symptoms listed on that request. This caused a long, unnecessary delay in the plaintiff receiving proper diagnostic testing and medical treatment, causing him to suffer irrepairable harm, physically and mentally.

B. Order the defendants, in their individual capacities, jointly and severally, to pay the plaintiff compensatory damages.

C. Order the defendants, in their individual capacities, jointly and severally, to pay the plaintiff punitive damages.

E.

D. Order the defendants, in their individual capacities, jointly and severally, to pay reasonable attorney fees and costs; and

E. Grant other just and equitable relief that this Honorable Court deems necessary.

Respectfully Submitted,

_Anthony Azukas_
Anthony Azukas #281876
Cheshire C. I.
900 Highland Avenue
Cheshire, CT 06410