**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ANTHONY AZUKAS, | |
|     *Plaintiff,* | No. 3:22-cv-00403 (MPS) |
| v. | |
| SCOTT SEMPLE, KRISTEN DONOHUE-GONZALEZ, and SHADANE M. HARRIS, | |
|     *Defendants.* | |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

On March 19, 2019, Anthony Azukas fell and hit his head outside the showers at Cheshire Correctional Institution ("Cheshire").  Two weeks later, he received an emergency craniotomy for a subdural hematoma.  Azukas claims that the defendants, a former Connecticut Department of Corrections ("DOC") commissioner, a nurse, and a nurse practitioner, violated his Eighth Amendment rights by (1) failing to implement a policy that ensured adequate coverage for medical emergencies and adequate medical staffing at Cheshire, and (2) being deliberately indifferent to his serious medical needs in the days and weeks that followed his fall.  The defendants have moved for summary judgment on all counts of Azukas's complaint.  For the reasons explained below, I grant summary judgment as to Defendant Semple and deny summary judgment as to Defendants Harris and Donohue-Gonzalez.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits.[1] All facts are undisputed unless otherwise indicated.[2]

---

[1] Azukas has filed two briefs on the docket, with numerous exhibits attached to both.  ECF No. 70; ECF No. 79.  Many of the documents filed at ECF No. 79—including Azukas's Rule 56(a)2 statement—are redacted,

## A.  The Parties

whereas those at ECF No. 70 are not.  Accordingly, I have relied on ECF No. 70 when preparing this ruling.  Plaintiff's counsel should be advised, however, that ECF No. 70 is not sealed and so the facts redacted in ECF No. 79 are still publicly available on the docket.  If Plaintiff wishes to seal his unredacted submissions, counsel should file a motion to seal ECF No. 70.

[2] The Local Rules of this Court require each party to present its version of the facts "in an orderly and structured manner that is designed to allow a judge to ascertain what facts are settled and what facts are in dispute." *Chimney v. Quiros*, 3:21-cv-00321, 2023 WL 2043290, at *1 (D. Conn. Feb. 16, 2023).  First, the party moving for summary judgment must file an enumerated statement of facts accompanied by specific citations to supporting evidence—the Local Rule 56(a)1 Statement—along with the cited admissible evidence supporting each individual statement of fact.  *See* D. Conn. L. Civ. R. 56(a)1, 3.  Then, the party opposing summary judgment must submit a responsive statement—the Local Rule 56(a)2 Statement—containing separately numbered paragraphs corresponding to the paragraphs set forth in the moving party's Local Rule 56(a)1 Statement and indicating whether he admits or denies the facts set forth by the moving party in each paragraph.  D. Conn. L. Civ. R. 56(a)2.  Each denial in the Local Rule 56(a)2 Statement must include specific citations to admissible evidence supporting the statement or denial, D. Conn. L. Civ. R. 56(a)3, such as an affidavit that has been "sworn to before an officer authorized to administer oaths, such as a notary public," or "an unsworn declaration, which is dated and signed by the declarant 'under penalty of perjury,' and verified as 'true and correct,'" *Lamoureux v. AnazaoHealth Corp.*, No. 3:03-cv-01382, 2010 WL 3801611, at *1 (D. Conn. Sept. 22, 2010).  The non-moving party is also required to submit in a separate section of his Local Rule 56(a)2 Statement entitled "Additional Material Facts" listing any additional material facts not included in the moving party's Local Rule 56(a)1 Statement that he contends "establish genuine issues of material fact precluding judgment in favor of the moving party."  D. Conn. L. Civ. R. 56(a)2.  These additional facts must also be followed by specific citations.  D. Conn. L. Civ. R. 56(a)3.

Donohue-Gonzalez and Azukas have both failed to comply with these requirements.  Donohue-Gonzalez's Local Rule 56(a)1 Statement is replete with assertions that lack valid supporting citations.  For example, many of her citations refer to "Exhibit C, Declaration of Donohue-Gonzalez."  *See, e.g.*, ECF No. 64-1 ¶ 46 (citing "Ex. C" in support of her assertion that she was "required to confer with medical providers (doctors) regarding assessments and recommendations for transport to outside medical services or hospitalization, unless such transport was required to address an urgent and life-threatening medical condition and a medical doctor was not available to confer and place the order").  But no such exhibit is attached her submission, and she has failed to provide her declaration even after Azukas pointed out Exhibit C's omission in his response.  ECF No. 70-2 at 18 ¶¶ 46-54, 59.  I have considered her unsupported assertions only where they were admitted by Azukas or supported by the evidence cited in Harris's and Semple's submission.

Azukas's Local Rule 56(a)2 Statement is likewise deficient.  Many of his citations refer to evidence that does not support the corresponding assertion or denial.  *See, e.g.*, ECF No. 70-2 at 1 ¶ 3 (denying that Harris "carefully observed the plaintiff…and asked him about his fall" but citing evidence regarding her verbal responses to his complaints).  The vast majority of his denials refer to the "Additional Material Facts" section of his submission (which is erroneously entitled "Disputed Issues of Material Fact"), rather than to admissible evidence.  *See, e.g., id.*; *id.* at 2 ¶ 8 (citing paragraph 87 of his Additional Material Facts section in support of his denial that "Harris instructed the plaintiff to contact medical with any changes in his symptoms").  And the citations used within the Additional Material Facts section are difficult to decipher, with acronyms and abbreviations like "HR" and "T" used throughout, often without any pinpoint citation. *See, e.g., id.* at 37 ¶ 82 (citing "HR" in support of his assertion that "Harris later changed her referral for follow up from Medical to Mental Health").  As the Court is "under no obligation to perform an independent review of the record to find proof of a factual dispute if the non-moving party fails to designate specific facts showing a genuine dispute of material fact," *Chalco v. Belair*, 738 F. App'x 705, 709 (2d Cir. 2018) (summary order) (internal quotation marks and alterations omitted), I have considered Azukas's assertions only where the supporting evidence could be located with reasonable effort.

Harris and Semple have also filed a response to Azukas's disputed issues of material fact submission.  ECF No. 80.  Such a response is not permitted by the Court's Local Rules and I have not considered it.

During the relevant time period of March 19 to April 2, 2019, Anthony Azukas was incarcerated at Cheshire.  ECF No. 64-1; ECF No. 70-2 at 11 ¶ 1, 24 ¶ 1. Shadane Harris was employed by the DOC as a registered nurse ("R.N.") and was assigned to Cheshire.  ECF No. 57-2 ¶ 1; ECF No. 70-2 at 1 ¶ 1.  Kristen Donohue-Gonzalez was a nurse practitioner ("APRN") with a private contract to render medical services for the DOC and was also assigned to Cheshire.  ECF No. 64-1 ¶¶ 2-3; ECF No. 70-2 at 11 ¶ 1.

Scott Semple was named Acting Commissioner of the DOC in September 2014, then became Commissioner on January 21, 2015.  ECF No. 57-2 ¶ 54; ECF No. 70-2 at 8 ¶ 53.  He served in this role until January 1, 2019, when he retired from state service.  ECF No. 57-2 ¶ 54; ECF No. 70-2 at 8 ¶ 53.  He was no longer a state employee and had no control over the medical services or care provided by the DOC at the time of Azukas's fall on March 19, 2019.  ECF No. 57-2 ¶ 55; ECF No. 70-2 at 8 ¶ 53.

### B.  Azukas's Fall on March 19, 2019

Azukas claims that he slipped and fell outside of the showers at Cheshire on March 19, 2019.  ECF No. 70-2 at 24 ¶ 2.  There were no shower mats on the floor where he fell, and his head hit the wet tile floor with force.  *Id.* at 24 ¶¶ 2-4; ECF No. 70-4 at 17.

According to Azukas, he did not immediately feel any effects from his fall, but he began to experience symptoms a couple hours later.  *Id.* at 24-25 ¶¶ 6, 8-9.  His legs suddenly became numb, and he was unable to control his arms, which prevented him from getting up from his bunk.  *Id.* at 25 ¶ 9.  Azukas also had difficulty breathing.  *Id.*  He felt a squeezing feeling around his neck, like he was being choked, and developed a severe headache.  *Id.*  He could also hear his heart beating in his ears.  *Id.*  All of these symptoms except the headache then suddenly abated.  *Id.*

At the time, nurses who worked the evening shift at Cheshire would rotate between providing medical care at the medical unit desk and distributing medication to inmates.  ECF No. 57-2 ¶ 15.  On the night of March 19, 2019, Defendant Harris was assigned to distribute medication.  ECF No. 57-2 ¶ 3; ECF No. 70-2 at 1 ¶ 3, 25 ¶ 10.  As she was delivering Azukas's medication, Azukas informed her that he had slipped in the shower that day.  ECF No. 57-2 ¶ 3; ECF No. 70-2 at 1 ¶ 3.  He described the symptoms he had experienced in the hours since and explained that, while his other symptoms had gone away, he continued to have a headache.  ECF No. 57-2 ¶ 4; ECF No. 70-2 at 25-26 ¶¶ 12-13.

The parties dispute other details regarding this interaction.  Harris contends that she observed Azukas while speaking to him and he did not appear to be in any distress.  ECF No. 57-2 ¶ 3.  Rather, he was responding to questions and speaking in a normal manner.  *Id.*  But according to Azukas, he told Harris that he thought that he had damaged something "vital," ECF No. 70-2 at 1 ¶¶ 3-4, 25-26 ¶ 14, and she was indifferent to his concerns, *id.* at 26-27 ¶ 19.  She told him that there was nothing she could do for him because there was no doctor on duty, the medical unit was short-staffed, and she was busy delivering medication.  ECF No. 70-2 at 26-27 ¶¶ 19, 22.

Harris told Azukas to submit a written request for a medical examination (a "sick call request") through the sick call request box.  ECF No. 57-2 ¶ 5; ECF No. 70-2 at 27 ¶¶ 21.  According to Azukas, Harris assured him that someone from the medical unit would see him the following day—a promise that proved to be false.  *Id.* at 27-28 ¶¶ 22, 27.

Harris contends that she also advised Azukas to contact a nurse if his condition changed.  ECF No. 57-2 ¶ 5.  Azukas disputes this and asserts that Harris did not provide him with any medical advice related to his injury.  ECF No. 70-2 at 27 ¶ 22.

4

### C. Azukas's Inmate Request Form

Per Harris's instructions, Azukas completed a CN 9601 Inmate Request Form ("IRF"), on which he detailed his fall and the symptoms he experienced hours later. ECF No. 1-1 at 2; ECF No. 70-31.  The form indicates that it was submitted to "Dr. Ruiz/Medical," and contains the following request:

> Today, at 1:30 recreation in South 5, I slipped and fell on the tiles when I stepped out of the downstairs showers.  I fell pretty hard and I hit the top of my head, but I was not cut.  I thought everything was ok, but around 5:00 p.m., after chow was complete, I started feeling very strange in my neck area. I tried to stand up, but I could not.  I was having a hard time using my right arm, and it felt like my neck was in a vice.  I could feel and hear my heartbeat in my ears.  Then all of a sudden, it all went away.  I believe that I may have damaged something vital.  Could I please see the doctor? Thank you.

ECF No. 70-8 at 11; ECF No. 70-10 at 12.

The parties dispute when the IRF was submitted.  Azukas claims that he completed the form immediately after his interaction with Harris on the night of March 19, 2019.  ECF No. 70-2 at 27 ¶ 25.  He asserts that he tried to hand the form directly to her, but she refused to take it and instead directed him to deposit it into the sick call request box.  *Id.* at 27-28 ¶ 26.  Azukas says that he did so.  *Id.*

Defendants contend that the IRF was received on March 23, 2019.  ECF No. 57-2 ¶ 6; ECF No. 64-1 ¶ 12.  Azukas agrees that his IRF was stamped "Received" on March 23, 2019, but asserts that it was not processed until this date but was submitted earlier.  ECF No. 70-2 at 28 ¶ 31.

Azukas contends that Harris did not prepare a medical report or otherwise record her interaction with him on March 19, 2019.  *Id.* at 29 ¶ 34.  But Harris appears to have prepared and signed a "Test Form" and "Encounter Form" on March 23, 2019, the same day his IRF was

stamped received.  *Id.*; ECF No. 70-25; ECF No. 70-42.  According to Azukas, the Test Form purports to document the provision of medical service to Azukas, but no medical service was provided to him on March 23, 2019.  ECF No. 70-2 at 29-30 ¶¶ 36-37.  He contends that the Test Form may be inauthentic because it bears the date May 31, 2022, rather than March 23, 2019; lists Azukas's age as it was in 2022, rather than 2019; and indicates that it was signed by Harris on March 23, 2019, despite her claim that she was not working on that date.  *Id.* at 30 ¶¶ 38-41.

### D.  Azukas's Condition Worsens

According to Azukas, no one from the medical unit saw him on March 20, 2019, despite Harris's promise the previous day.  ECF No. 70-2 at 28 ¶ 27; ECF No. 1 at 14 ¶¶ 24-25.

He attended his usual college classes on March 20 but returned with a severe headache. ECF No. 57-2 at 5 ¶ 28; ECF No. 70-2 at 6 ¶ 28, 30 ¶ 42.  He approached an unidentified nurse in the hallway that day, explaining again his head injuries and symptoms.  ECF No. 57-2 ¶¶ 29-30; ECF No. 70-2 at 31 ¶ 43.  Like Harris, this nurse told him to submit a written sick call request.  ECF No. 57-2 ¶ 33; ECF No. 70-2 at 7 ¶ 33, 31 ¶ 43.

From March 20 to April 2, Harris and other nurses delivered medication to Azukas.  ECF No. 57-2 ¶¶ 8-11, 14-15; ECF No. 70-2 at 2-3 ¶¶ 9-11.  Harris delivered nighttime medication to Azukas on March 21, March 22, March 25, March 26, March 27, and April 1, 2019.[3]  ECF No. 57-2 ¶ 14.  She was not working on March 20, March 24, March 28, March 29, March 30, or March 31, 2019, so other nurses provided medication to Azukas on these evenings. *Id.* ¶¶ 8, 10. Other nurses also provided medication to Azukas each morning.  ECF No. 57-2 ¶ 11.

The parties dispute the nature of Azukas's interactions with Harris and the other nurses during medication administration.  According to Harris, she and the other nurses observed

---

[3] The parties dispute whether Harris was working on March 23, 2019.  ECF No. 57-2 ¶ 8; ECF No. 70-2 at 2 ¶ 8, 29-30 ¶¶ 36-41.

Azukas on each of these days and, from what they observed, Azukas's condition was not life threatening and he was not in any acute distress.  ECF No. 57-2 ¶¶ 10-11, 14, 22.  She would have requested that Azukas receive emergency care if she deemed it necessary but, "[i]n her professional judgment and experience, [Azukas] did not have a serious medical need while Harris was caring for him."  *Id.* ¶¶ 23-24.  She contends that Azukas's medical records do not reflect that he made additional complaints to other nurses during this time.  *Id.* ¶ 13.  And, "[d]uring the time period Harris was providing care to [Azukas], she was not contacted by any custodial staff or other inmates to report concerns that [Azukas's] condition was deteriorating or that he had any new symptoms such as vomiting."  *Id.* ¶ 12.

Azukas disputes these facts.  He contends that the nurses administering medication did *not* examine him, observe him, or question him about his injury or symptoms.  ECF No. 70-2 at 29 ¶ 33; 31-32 ¶¶ 44-47, 50.  He claims his condition was also visibly deteriorating over this period.  By March 29, 2019, other inmates were assisting him to walk.  *Id.* at 31 ¶¶ 44-46; *see also* ECF No. 70-43.  According to one inmate, he tried talking to Azukas at around this time, but he was "out of it" and "barely noticed [him]."  *Id*.  And according to Azukas's cellmate, Naraj Patel, Azukas was at one point having trouble talking and taking his pills; but when he tried to talk to the nurse about it, she "snatched his pills back, said he was refusing, and slammed the door in his face."  ECF No. 70-34; *see also* ECF No. 70-2 at 31 ¶ 46.  Azukas also claims that he made numerous requests to be seen by the medical unit to the nurses administering medication, including Harris.  ECF No. 70-2 at 3 ¶ 14; 31 ¶ 46-47.  But, according to Patel, the nurses were "always in a rush."  ECF No. 70-34 at 1.  They would tell Azukas to file a written sick call request and, when he said he had already done so, they said to "be patient" and that they were short staffed.  *Id.*; *see also* ECF No. 70-2 at 32 ¶¶ 48-49.

According to Azukas and Patel, they and other inmates could not get anyone at Cheshire to listen to Azukas's concerns until April 2.  *Id.* at 32 ¶¶ 51-52; ECF No. 70-34 at 1.  That evening, at around 8:00 pm, Patel informed Correctional Officers ("C.O.s") Steiner and Ferrerra that Azukas was sleeping excessively, not eating, vomiting periodically, and "more quiet" than usual; that he, Azukas, and other inmates had been attempting to get medical staff to see Azukas since his fall, but to no avail; and that he believed Azukas was in need of immediate medical attention.[4]  ECF No. 70-2 at 33 ¶¶ 54-56; ECF No. 70-39 ¶¶ 7-10.  Steiner observed Azukas in his cell and found him to be "lethargic, speaking slowly, having difficulty getting his thoughts together and expressing himself, … [and] having great difficulty getting up and out of bed."  *Id.* ¶ 11.  Azukas also appeared to be "unable to come out of his cell," and was "unshaven and poorly groomed, which was uncharacteristic for him."  *Id.*  His observations of Azukas at this time were "completely different [from those] before he fell and injured his head."  *Id.* ¶ 12. Steiner concluded that Azukas was "in great physical distress," "not himself," and that "something was very wrong with him."  *Id.*

Steiner and Ferrerra returned to their desk, and Steiner instructed Ferrerra to report Azukas's condition to the medical unit. *Id.* ¶ 13.  Ferrerra then called the medical unit and described to the nurse on duty Azukas's condition.  *Id.* ¶¶ 13-15; ECF No. 70-2 at 34 ¶¶ 59-61. Immediately following this call, Azukas was sent to the medical unit.  *Id.* ¶ 16; *see also* ECF No. 70-2 at 34 ¶ 63.

---

[4] Defendants Harris and Semple contend Steiner was not disclosed as a witness, but they provide no evidence in support of this allegation.  ECF No. 81 at 20.  They further assert that the affidavit does not list the relevant time frame for many of his observations.  *Id.*  But Steiner clearly states that his interaction with Patel occurred at 8:00 pm on the evening of April 2, 2019 and identifies the dates on which subsequent events occurred. ECF No. 70-39.

### E.  Treatment by Defendant Harris on April 2, 2019

Once in the medical unit, Azukas was seen by Defendant Harris. ECF No. 57-2 ¶ 17; ECF No. 70-2 at 34 ¶¶ 63-64.  According to Azukas, Harris told him that she was the only medical professional on duty at that time.  *Id.* at 34 ¶ 62.

The parties dispute the details of this interaction. Harris contends that she examined Azukas, including by checking him for neurological deficits.  ECF No. 57-2 ¶ 17.  Azukas did not have any physical swelling, bruising, or lacerations on his scalp; his gait and pupils were normal; he had equal strength in his arms and legs; his balance and physical examination were "within normal limits" and he had a "steady gait."  *Id.*  He was "oriented to place and person," but "forgot what day it was and reported losing track of time" and had a "flat, blunted affect." *Id.*  ¶¶ 17-18.  He did not report nausea or vomiting, but did "complain[] of a history of headaches" as well as moderate, intermittent neck pain.  *Id.* ¶ 17.

But according to Azukas, Harris did not conduct many of the tests she claims to have performed and much of her medical report regarding this interaction is inaccurate.[5]  ECF No. 70-2 at 36 ¶¶ 77-78.  She did not examine his arms, as she claims; his balance was not within normal limits and he was having difficulty standing and walking; and, contrary to what Harris indicated in her medical report, he was not able to maintain eye contact.  *Id.* at 36 ¶ 78.

Harris prescribed Azukas Motrin and hot compresses and placed him on a list to receive follow-up care from an APRN.  ECF No. 57-2 ¶ 18.  She also requested a follow-up from the mental health unit.  *Id.*  Harris asserts, and Azukas disputes, that she also instructed Azukas to contact medical if his symptoms changed in any way.  *Id.*; ECF No. 70-2 at 4 ¶ 18.

---

[5] Harris asserts that Azukas "could not recall what Nurse Harris did when examining him," because it occurred after he "lost [his] entire mind."  ECF No. 57-2 ¶¶ 39-40.  But Azukas asserts that he had a "clear recollection" of her physical exam and that it was only "the last day when he saw Dr. Ruiz, April 4, 2019, [for which he has] a partial memory of the events."  ECF No. 70-2 at 36-37 ¶¶ 79-80.

C.O. Steiner was "surprised" that Azukas was sent back to his cell with over-the-counter medication.  *Id.* at 35 ¶ 68.  He avers that, "[g]iven [Azukas's] reported nausea, vomiting, excessive sleeping, inability to get out of bed and the other symptoms related to Harris in the telephone call leading to him being seen by Medical,…[i]t did not seem right."  ECF No. 70-39 ¶ 21.

### F.  Treatment by Defendant Donohue-Gonzalez on April 3, 2019

On April 3, 2019, Azukas was seen by Lisa M. Simo-Kinzer, a licensed clinical social worker ("LCSW"), in the mental health unit.  ECF No. 57-2 ¶¶ 19, 48; ECF No. 64-1 ¶ 23; ECF No. 70-2 at 4 ¶ 19, 38 ¶ 88.

According to Simo-Kinzer's notes, Azukas shared with Simo-Kinzer that he "fell in the shower a week ago and hit his head on the tiles," that he had "severe pain in his neck," that he had been having difficulties with knowing what day it was, and that these symptoms began after his fall.  ECF No. 1-1 at 9; *see also* ECF No. 70-2 at 38 ¶ 89.  Simo-Kinzer contacted C.O. Steiner, who shared that Azukas's cellmate had reported that Azukas "hasn't been eating alot and was vomiting yesterday," that "[h]e slept alot yesterday and didn't come out for rec today or school," and that he had been "more quiet."  ECF No. 1-1 at 9.  Simo-Kinzer believed that Azukas's symptoms were "more medically based than psychiatric," and so reviewed her concerns about his symptoms with Dr. Cartwright.[6]  ECF No. 1-1 at 10; *see also* ECF No. 57-2 ¶ 20; ECF No. 64-1 ¶ 23; ECF No. 70-2 at 38 ¶ 90.  She also "reviewed what [C.O. Steiner] shared."  ECF No. 1-1 at 10.

Dr. Cartwright decided to "go to medical with [Azukas] to discuss [his] case with [an] APRN and/or MD."  *Id.*  There, Dr. Cartwright and Azukas encountered Defendant Donohue-

---

[6] Defendant Donohue-Gonzalez describes Dr. Cartwright as a "non-party treating medical doctor," ECF No. 64-1 ¶ 27; according to Azukas, Dr. Cartwright is a psychiatrist, ECF No. 70-2 at 40 ¶ 101.

Gonzalez, who explained that she was the only person working in the medical unit that day. ECF No. 64-1 ¶ 25; ECF No. 70-2 at 15 ¶ 25; *see also* ECF No. 57-2 ¶ 48.  Azukas and Dr. Cartwright spoke with Donohue-Gonzalez in detail about Azukas's injury and the duration of his symptoms.  ECF No. 64-1 ¶ 26; ECF No. 70-2 at 15 ¶ 26.

Donohue-Gonzalez performed a full physical and neurologic exam to assess Azukas's injury and condition.  ECF No. 64-1 ¶ 27; ECF No. 70-2 at 15 ¶ 27.  According to her notes, Azukas had no physical swelling, bruising, or lacerations on his scalp and his speech was "clear with intermittent/infrequent slurring."  ECF No. 1-1 at 13.  His visual fields were also "intact," and he was able to "perform all motions of the eyes and tongue [on] command," but he reported blurriness "along the left periphery."  *Id.* at 13-14.  He was also able to "perform all activities of the upper extremities," "discern touch along the upper and lower extremities," and "identify [his] digits as they [were] touched."  *Id.*  But Donohue-Gonzalez noted that Azukas "grimace[d] on palpitation of the scalp"; that there was rigidity and tenderness along the base of his skull, neck, and trapezius muscles; and that although he was able to stand without hesitation, when he was asked to close his eyes and stand upright, "there [was] a teetering to the right."  *Id.*  Further, when he was asked to "perform [a] one legged stance," he lost balance on the right.  *Id.*  And, after performing these exercises, Azukas reported a "fuzzy sensation in his head."  *Id.* (internal quotation marks omitted).  Donohue-Gonzalez noted that Azukas had experienced a "loss of days," and was "confused about today's date and the period between showering and…today." *Id.*  She also recorded C.O. Steiner's observation that Azukas, "who is normally well groomed[,] ha[d] not shaved this week and ha[d] been asleep for … most of the week in his cell with the lights out."  *Id.*

Donohue-Gonzalez's primary assessment was that Azukas had a concussion with a bad headache, and her secondary assessment was "[l]oss of time." ECF No. 1-1 at 14; ECF No. 64-1 ¶ 28; ECF No. 70-2 at 15 ¶ 28.  Donohue-Gonzalez determined that Azukas needed a CT scan and advised Azukas that she would place a request for one to be performed.  ECF No. 64-1 ¶ 31; ECF No. 70-2 at 16 ¶ 31.  She then sent Azukas back to his cell with Motrin.  ECF No. 64-1 ¶ 33; ECF No. 70-2 at 16 ¶ 34, 45 ¶ 139; *see also* ECF No. 1-1 at 14 (indicating that Donohue-Gonzalez advised Azukas to "[t]ake anti inflammatory as needed for [headache]").

Azukas contends that Donohue-Gonzalez had the authority as an APRN to send him to the hospital for emergency medical treatment, but that she chose not to do so.  ECF No. 70-2 at 45 ¶¶ 138-140.  He further contends that Donohue-Gonzalez requested X-rays, rather than a CT scan.  *Id.* at 44 ¶ 132; *see* ECF No. 70-41 (the "Test Form" signed by Donohue-Gonzalez on April 3, 2019, which contains the following description: "XR SKULL COMPLETE 4+ VW").  He also notes that on the form requesting these tests, Donohue-Gonzalez listed Azukas's diagnosis as "confusion" rather than "concussion" or "loss of time," and indicated that his conditions and tests were non-priority.  *Id.*; ECF No. 70-2 at 44-45 ¶¶ 133-136.

### G. Hospital Transfer and Surgery on April 4 and April 5, 2019

Azukas asserts that, on April 4, 2019 at 2:30 pm, Dr. Cartwright came to his housing unit and asked whether he had been seen by medical staff.  ECF No. 70-2 at 46 ¶ 145.  When Azukas informed her that he had not, she became "visibly aggravated" and stated "Let's go! They are seeing you RIGHT now…!"  *Id.* at 46 ¶¶ 147-148.  She brought Azukas to the medical unit, where she relayed all of the information regarding Azukas's treatment and condition to Dr. Ruiz.  *Id.* at 46-47 ¶¶ 149-150.

According to Azukas, his symptoms had worsened markedly since his visit with Donohue-Gonzalez the previous day.  ECF No. 70-2 at 46 ¶ 143.  He could barely move, was not eating, and had written a goodbye letter to his daughter because he thought he was about to die.  *Id.* at 46 ¶¶ 143-144.  He could walk only by holding onto the wall.  *Id.* at 46 ¶ 143.

Dr. Ruiz performed tests and reported in his notes that Azukas complained that he had "throbbing bitemporal headaches" and a "shadow in the [l]eft upper outer quadrant of his left eye vision."  *Id.* at 47 ¶¶ 151-153; *see also* ECF No. 70-37 at 1.  Dr. Ruiz's notes also indicate that Azukas had "[d]ecreased recall," "[s]luggish alternating hand movement on the left," and that his speech was "slower than his usual."  *Id.* at 1.  The notes show that there were active orders for, among others, an "XR SKULL COMPLETE 4+ VW."  ECF No. 70-37 at 4.  According to Azukas, this indicates that Donohue-Gonzalez had ordered a skull X-ray, but that an order for a CT scan had not yet been placed.  ECF No. 70-2 at 47 ¶ 155.  Dr. Ruiz's notes appear to also diagnose Azukas with either a concussion or an "intracranial process."  ECF No. 70-37 at 1; *see also* ECF No. 70-2 at 47 ¶ 154.

Dr. Ruiz sent Azukas to the UConn Health Emergency Department for evaluation and treatment.  ECF No. 70-37 at 1; ECF No. 70-2 at 47 ¶ 158.  He advised the Emergency Department to "consider CT scans of both head and neck."  *Id.* at 2.

Azukas was transported to the hospital.  ECF No. 70-2 at 47 ¶ 157.  His medical records from UConn Health indicate that he was admitted to the Emergency Department at 5:58 pm and underwent a CT scan at 6:51 pm.  ECF No. 70-24 at 1, 3.  His CT scan revealed a "[l]arge acute/subacute left subdural hematoma."  *Id.* at 2.  His neurosurgeons explained that a subdural hematoma is a "brain bleed" that bleeds constantly and thus worsens over time.  ECF No. 70-2 at

51 ¶ 196.  Azukas was admitted to the intensive care unit ("ICU") for neurological monitoring

and an emergency craniotomy was scheduled for the following morning.  ECF No. 70-24 at 1, 3.

Azukas underwent a craniotomy on April 5, 2019.  ECF No. 70-2 at 48 ¶ 164.  He was

discharged from the hospital on April 12, 2019. ECF No. 70-23 at 10, 15.  His discharge

summary notes warn that he should discontinue his use of "aspirin and Motrin which can

encourage bleeding."  *Id.* at 10.  Azukas was then transferred to the infirmary at MacDougall

Correctional Institution.  ECF No. 70-29 at 1.  Twelve days later, on April 24, 2019, he was

admitted to the infirmary at Osborn Correctional Institution ("Osborn"), ECF No. 70-33 at 1,

where the remained until he was returned to general population on August 1, 2019.  ECF No. 70-

2 at 48 ¶ 167.

## H. Administrative Directives

Defendants Harris and Semple have attached as exhibits copies of Administrative

Directive 8.9 ("A.D. 8.9") and Administrative Directive 9.6 ("A.D. 9.6") as they existed at the

time.[7]  ECF No. 57-5.  A.D. 8.9 sets forth procedural rules for inmates seeking formal review "of

any health care provision, practice, diagnosis or treatment," also known as a "Health Services

Review."  *Id.* at 1 ¶ 1.  A.D. 9.6 sets forth the rules for all other "issue[s] relating to any aspect of

an inmate's confinement that is subject to the Commissioner's authority."  ECF No. 57-5 at 6 ¶

1, 19 ¶ 6.

Under A.D. 8.9, the inmate must first "attempt to seek an informal resolution."

Specifically:

---

[7] A.D. 8.9 and A.D. 9.6 were both updated on April 30, 2021.  *See* ADMINISTRATIVE DIRECTIVE 8.9: HEALTH SERVICES ADMINISTRATIVE REMEDIES, STATE OF CONN. DEP'T OF CORR. (2021), https://portal.ct.gov/-/media/doc/pdf/ad/ad0809pdf.pdf; ADMINISTRATIVE DIRECTIVE 9.6: INMATE ADMINISTRATIVE REMEDIES, STATE OF CONN. DEP'T OF CORR. (2021), https://portal.ct.gov/-/media/doc/pdf/ad/ad9/ad_0906_effective_04302021.pdf.  This opinion describes the grievance procedures that were in effect in 2019—not the current versions of these policies.

> The inmate must attempt to resolve the issue face to face with the appropriate staff member or with a supervisor via written request utilizing CN 9601 Inmate Request Form. The inmate must clearly state the problem and action requested to remedy the issue. The request must be free of obscene or vulgar language or content. A response to the inmate shall be made within 15 calendar days from receipt of the written request.

*Id.* at 3 ¶ 10. If informal resolution is unsuccessful, then the inmate "may apply for a Health Services Review." *Id.* at 3 ¶ 11.

There are two types of Health Services Review requests: one for "[a] review of diagnosis or treatment including a decision to provide no treatment, relating to an individual inmate," and another for "[a] review of a practice, procedure, administrative provision or policy, or an allegation of improper conduct by a health services provider." *Id.* 2-3 ¶ 9. To obtain a diagnosis and treatment review, the inmate must:

> [C]heck the 'Diagnosis/Treatment' box [on the CN 9602, Inmate Administrative Remedy Form] and explain concisely the cause of his/her dissatisfaction, and deposit the completed form in the Health Services Remedies/Review box. The inmate should provide a concise statement of what particular diagnostic or treatment decision he/she believes to be wrong and how he/she has been affected.

*Id.* at 3 ¶ 11. Upon receipt of a diagnosis and treatment review, the Health Services Review Coordinator is required to "schedule a Health Services Review Appointment (HSRA) with a physician, dentist, or psychologist/psychiatrist, as appropriate, as soon as possible and at no cost to the inmate, to determine what action, if any, should be taken." *Id.* "If the physician decides that the existing diagnosis or treatment is appropriate, the inmate shall have exhausted the health services review." *Id.* The physician may also order a different diagnosis or treatment or can "refer the case to the Utilization Review Committee." *Id.*

To obtain a review of an administrative policy or practice, the inmate must:

> [C]heck[] the 'All Other Health Care Issues' box on CN 6902, Inmate
> Administrative Remedy Form, and deposit[] it in the Health Services box. The
> inmate should provide a concise statement of what he/she believes to be wrong
> and how he/she has been affected.

*Id.* at 4 ¶ 12. Each administrative policy review is supposed to "be evaluated, investigated and

decided upon by HSR Coordinator within thirty (30) days." *Id.* "If the inmate is dissatisfied

with the response, the inmate may appeal within ten (10) business days by completing CN 8901,

Appeal of Health Services Review[,] and depositing it in the Health Services box." *Id.* This

appeal is supposed to be decided "within fifteen (15) business days" of its receipt "by the

contracted health services provider." *Id.* The inmate may then "appeal to the DOC Director of

Health Services within ten (10) business days" of receiving that response. *Id.* The "DOC

Director of Health Services or designee shall notify the inmate of the [appeal] decision" within

thirty (30) days of receiving this appeal. *Id.* "Upon receipt of this decision, the inmate shall

have exhausted the Health Services Review for administrative issues." *Id.*

A.D. 9.6 also requires inmates to "seek informal resolution prior to filing an inmate

grievance." *Id.* at 10 ¶ 6. "[I]f the inmate is not satisfied with the informal resolution offered,"

he may file a grievance. *Id.* at 11 ¶ 6. Unlike A.D. 8.9, however, A.D. 9.6. requires grievances

to be filed "within 30 calendar days of the occurrence or discovery of the cause of the

grievance." *Id.*

## I. Azukas's Grievances

In early July 2019,[8] Azukas filed three CN 9602 Inmate Administrative Remedy Forms

("grievances") with the Health Services Review Coordinator at Osborn, ECF No. 57-2 ¶ 58; ECF

No. 64-1 ¶ 61; ECF No. 70-2 at 52 ¶ 203, and with the Health Services Review Coordinator at

---

[8] Azukas asserts that these requests were filed on July 2, 2019, ECF No. 70-2 at 52 ¶ 201, while Defendants
claim they were filed on July 7, 2019, ECF No. 57-2 ¶ 58; ECF No. 64-1 ¶ 61.

Cheshire, ECF No. 70-2 at 52 ¶ 202-203.  Each grievance addressed a separate issue related to his fall.  The first took issue with Nurse Harris's "failure to respond appropriately [to Azukas's verbal reports on March 19, 2019, which] caused a delay in proper treatment, which in turn, caused me to suffer much more permanent damage than I would have had I received proper treatment within a timely manner,"  and requested that "all medical staff [be updated] on the appropriate response to reported head injuries."  ECF No. 70-8 at 5; ECF No. 70-10 at 5.  The second addressed the fact that he "was never called for 'sick call'"—despite reporting his symptoms to the nurse verbally and in writing on March 19, 2019—and asserted that it took 80 hours it took 80 hours for his sick call request to be logged into the computer system.  ECF No. 70-8 at 7; ECF No. 70-10 at 8.  And the third contended that Defendants Harris and Donohue-Gonzalez sent him back to his cell on April 2 and April 3, 2019, respectively, even though his serious condition was, at that point, "so obvious that the layperson, such as other inmates and custody staff recognized it."  ECF No. 70-8 at 10; ECF No. 70-10 at 11.

On each grievance, Azukas checked off the box for a Health Services Review regarding "All Other Health Care Issues."  ECF No. 70-8 at 3, 6, 8; ECF No. 70-10 at 3, 6, 9.  Azukas attached to these grievances a copy of the CN 9601 Inmate Request Form ("IRF") that he completed on the day of his fall and that was marked received on March 23, 2019.  ECF No. 70-8 at 11; ECF No. 70-10 at 12.

According to Azukas, his grievances went unanswered.  ECF No. 70-2 at 54 ¶ 210.  So, on August 15, 2019, he filed a CN 8901 "Appeal of Health Services Review" form.  *Id.*; *see also* ECF No. 70-10 at 14.   And on September 9, 2019, he filed another CN 8901 to "appeal[] the nonresponse to both [his] Level 1 and Level 2 Health Services Reviews."  *Id.* at 19; ECF No. 70-2 at 54 ¶ 211.

On February 21, 2020, Colleen Gallagher—the Program Director of Quality Improvement in the DOC's Health and Addiction Services Unit—wrote to Azukas and informed him that his "administrative remedy dated 7/2/19 and subsequent appeals have been sent to central office for review and response … due to the delay / back log at Cheshire." *Id.* at 55 ¶ 212; ECF No. 70-10 at 15. She explained that because Azukas had "written level 1 and 2 and three already and the time frame [was] past for answering," he could "consider [his] remedy exhausted due to failure to respond in a timely manner." *Id.* She added that if Azukas wanted his "remedy to be investigated and a decision rendered," she would "do so at level 3 and … provide a time extension notice." *Id.* Azukas replied on March 9, 2020 that he "would like [for Gallagher] to investigate and render decisions on [his] remedies," so as to ensure that "no other individual ever has to suffer the same types of damage and loss, as I have suffered." *Id.* at 17; *see also* ECF No. 70-2 at 55-56 ¶¶ 218-219. On March 6, 2020, Gallagher "upheld" Azukas's requests to "update/review policy on head injury response." ECF No. 70-10 at 19.

**J. Azukas's Injuries**

According to Azukas's medical reports, his surgery left him with 65 staples in his skull. ECF No. 70-20 at 3; *see also* ECF No. 70-2 at 48 ¶ 166. Azukas claims this incision has left him with a scar the size and shape of a horseshoe, as well as nerve damage to the left side of his head, face, and neck. *Id.* at 48-49 ¶¶ 166, 170.

Azukas claims that he also suffers from chronic neck and shoulder pain, hypersensitivity to light and sounds, and memory loss as a result of his traumatic brain injury ("TBI"). ECF No. 70-2 at 48-49 ¶¶ 168-178. He also requires a cane to walk and cannot read, write, draw, concentrate, or formulate ideas as he did before his injury. *Id.* at 49-50 ¶¶ 172-173, 179, 183. Because of these issues, he has dropped out of his college courses and has become depressed. *Id.*

at 49-50 ¶¶ 180-182, 185-186.  His family and other inmates have also noticed a "significant personality change."  *Id.* at 50 ¶ 182.

Azukas contends that Defendant Harris and Defendant Donohue-Gonzalez's conduct was unreasonable and contributed to the extent of harm he has experienced.  *Id.* at 51-52 ¶¶ 193-194, 199-200.  He explains that his neurosurgeon, Dr. Bulsara, told him that hours, not days, make a difference with the type of injury he experienced.  *Id.* at 52 ¶ 198-199.  His neurosurgeon also told him that one would typically drill a hole "the size of a dime" in order to treat this type of injury.  ECF No. 70-2 at 48 ¶ 163.  But because so much blood had pooled in his brain, he explained that they would have to cut a hole "the size of [Azukas's] fist."  *Id.*[9]

Azukas has also submitted an affidavit from Nikki Amatruda, an R.N. who reviewed Azukas's case documentation.[10]  ECF No. 70-3.  She contends that Azukas's injuries "could have potentially been avoided if proper medical care and attention had been given at the time of [his fall]."  *Id.* at 5.  But on the day of Azukas's injury, his symptoms were overlooked and standard nursing care was neglected.  *Id.*  Amatruda explains that "Motrin … is known by trained medical personnel to increase your risk of bleeding and should not have been given when presenting with such symptoms."  *Id.*  She adds that, "[i]t is well known, especially by medically trained personnel, that symptoms of a serious head injury can show up hours, days, or even weeks after the injury is sustained."  *Id.*  Thus, even if "the initial assessment did not indicate the

---

[9] Because these statements by Azukas's UConn physicians are likely inadmissible hearsay, I do not consider them in my analysis, even though the defendants have not specifically challenged them.

[10] Defendants Harris and Semple contend that Azukas improperly relies on this affidavit because Amatruda was not disclosed as a witness, but they provide no evidence in support of this allegation.  ECF No. 81 at 20.  Defendants further contend that the affidavit is inadmissible because it is based on an unknown foundation and hearsay.  *Id.*  But, in her affidavit, Amatruda explains that she is an R.N. who has been employed in the medical for 5 years, "1 of which was in a TBI (traumatic brain injury) unit"; that she has been contracted as an R.N. in both New Haven Correctional Facility and Bridgeport Correctional facility, so she is "familiar with the protocols and the terminology used in these institutions"; and that she "reviewed the case documentation related to Anthony Azukas."  ECF No. 70-3 at 1, 4.

need for immediate treatment, continuous and thorough assessments should have been conducted to ensure that there was no risk of severe injury." *Id.*

Azukas's contends that Defendants Semple, Harris, and Donohue-Gonzalez violated his Eighth Amendment right to be free from cruel and unusual punishment. ECF No. 1 at 32-34. The defendants have moved for summary judgment on all counts.  ECF No. 57; ECF No. 57-1; ECF No. 64.

## III.   LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).   In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).   "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *Celotex Corp. v. Catrett1*, 477 U.S. 317, 323-25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).   "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## IV.    DISCUSSION

Azukas brings the following claims under 42 U.S.C. § 1983: (1) Defendant Semple violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to implement a policy that ensured adequate coverage for medical emergencies and adequate medical staffing, and (2) Defendants Harris and Donohue-Gonzalez violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  ECF No. 1 at 32-34; ECF No. 8 at 6-7, 12.  For the reasons explained below, I grant the defendants' motions for summary judgment as to Semple but deny them as to Harris and Donohue-Gonzalez.

### A.  Supervisory Liability

To recover damages under section 1983 against a supervisory official like Semple, a plaintiff must demonstrate the defendant's "personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  Azukas does not dispute that Semple retired from state service on January 1, 2019, and had no control over the medical services or care provided by the DOC at the time of Azukas's fall.  ECF No. 57-2 ¶¶ 54-55; ECF No. 70-2 at 8 ¶¶ 53-54.  There is thus no genuine dispute of material fact as to whether he was personally involved in the constitutional violations Azukas alleges, all of which occurred on or after March 19, 2019.  Semple is thus entitled to summary judgment.

### B.  Administrative Exhaustion

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C.A. § 1997e.  "[T]he PLRA's exhaustion

requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "The Supreme Court has [further] held that the PLRA exhaustion requirement requires *proper* exhaustion. That is, prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (emphasis added) (internal quotation marks and citation omitted).

Here, Defendants claim that Azukas did not exhaust his claims against Harris and Donohue-Gonzalez because he did not follow the procedure for a Health Services Review under A.D. 8.9. They specifically contend that his grievances were untimely because they were not filed until "July 7, 2019, months after his fall on March 19th." ECF No. 57-1 at 37; *see also* ECF No. 81 at 3; ECF No. 64 at 57. But nothing in A.D. 8.9 required Azukas to have filed his initial grievances within a certain period of time. Though A.D. 9.6 requires grievances to be filed "within 30 calendar days of the occurrence or discovery of the cause of the grievance," no such language appears in A.D. 8.9. *See* ECF No. 57-5. Azukas has also presented evidence that he complied with A.D. 8.9, including written confirmation from a Program Director in the DOC's Health and Addiction Services Unit that he could "consider [his] remedy exhausted." ECF No. 70-10 at 15. Accordingly, Defendants are not entitled to judgment as a matter of law on the issue of administrative exhaustion.

### C.  Deliberate Indifference to Serious Medical Needs

"To state an Eighth Amendment claim against a prison official for providing inadequate medical care, an inmate must allege facts showing the offending official's deliberate indifference to a prisoner's serious medical needs." *Thomas v. Wolf*, 832 F. App'x 90, 92 (2d Cir. 2020)

(summary order).  "The standard for deliberate indifference includes a subjective component and an objective component."  *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

To satisfy the objective component, "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists."  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain."  *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (internal quotation marks and alterations omitted).  "In cases where a prisoner alleges a delay in medical treatment, courts examine both the seriousness of the prisoner's medical conditions and the harm caused by any unreasonable delay."  *Lombardo v. Graham*, 807 F. App'x 120, 123 (2d Cir. 2020) (summary order); *see also Valdiviezo v. Boyer*, 752 F. App'x 29, 32 (2d Cir. 2018) ("When the basis for a prisoner's claim 'is a temporary delay or interruption in the provision of otherwise adequate medical treatment,' [courts evaluate] whether the delay itself created a risk of harm." (quoting *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003))).

To satisfy the subjective component, the prisoner must show that the official "act[ed] with a sufficiently culpable state of mind."  *Hill*, 657 F.3d at 122 (internal quotation marks omitted).  "That is, the official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* (internal quotation marks and alterations omitted).  "Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—an act or a failure

to act…that evinces a conscious disregard of a substantial risk of serious harm." *Id.* at 123 (internal quotation marks omitted); *see also Thomas v. Nassau Cty. Corr. Ctr.*, 288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003) ("[A] delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces a conscious disregard of a substantial risk of serious harm." (internal quotation marks omitted)).

### 1. *Defendant Harris*

Azukas claims that Harris was deliberately indifferent to his serious medical needs by (1) failing to perform neurological tests on March 19 and April 2, 2019; (2) failing to prioritize Azukas's sick call request to ensure that he was treated; and (3) failing to have Azukas transported to the hospital on April 2, 2019.  ECF No. 1 at 33-34; ECF No. 8 at 6-7.  I conclude that there is a genuine dispute of fact as to both the objective and subjective components of this claim.

Harris contends that the objective prong is not satisfied because Azukas "has failed to establish the existence of a serious medical need *at the time she was treating him*."  ECF No. 57-1 at 21.  I disagree.  Azukas alleges that he was experiencing serious symptoms within hours of his fall on March 19 and that, by April 2, he was vomiting, sleeping excessively, and unable to walk without assistance, and other inmates and correctional officers believed he was in need of immediate medical assistance.  ECF No. 70-2 at 24-25 ¶¶ 6-9, 33-34 ¶¶ 55-58.  Further, I must consider both the seriousness of Azukas's medical needs at the time of treatment *and* the risk of harm created by delaying treatment.  Azukas has presented evidence that that his TBI could have been avoided if he had received proper medical care at the time of his fall, ECF No. 70-3 at 5; and that his condition progressively worsened after his interactions with Harris on March 19 and April 2, ECF No. 70-2 at 31-33 ¶¶ 44-56, 38 ¶ 89.  There is thus a genuine dispute of material

fact as to whether Azukas's condition—including the risk of harm he experienced as a result of Harris's alleged conduct—was "sufficiently serious" to ground an Eighth Amendment violation.

Harris argues that there is no genuine dispute of material fact as to the subjective prong because she used "her best professional judgment and experience when treating [Azukas]." ECF No. 57-1 at 28. But Azukas has presented evidence indicating that she knew of and disregarded an excessive risk of harm to his health and safety. He alleges that, within hours of his fall, he informed Harris of his injury and initial symptoms and told her that he believed that he had damaged something "vital." ECF No. 70-2 at 1 ¶¶ 3-4, 25-26 ¶¶ 12-14; *see also* ECF No. 70-4 at 20, 159; ECF No. 57-2 ¶ 4. He has presented evidence that it is well-known by medically trained personnel "that symptoms of a serious head injury can show up hours, days, or even weeks after the injury is sustained," ECF No. 70-3 at 5, and raises a genuine dispute about whether Harris fabricated portions of his medical record to make it appear as if he received medical care on March 23, although he did not, ECF No. 70-2 at 29-30 ¶¶ 36-41. Azukas further contends that his deteriorating condition was apparent to Harris when she distributed medication to him on March 21, March 22, March 25, March 26, March 27, and April 1. *Id.* at 3 ¶ 14, 16-17. And he has presented evidence indicating that C.O. Steiner informed Harris that Azukas had been vomiting, sleeping excessively, and unable to get out of bed before she saw him on April 2. *Id.* at 34 ¶¶ 59-61. Taken together, the evidence Azukas has submitted is enough to raise a factual dispute about whether Harris evinced a conscious disregard of a substantial risk of serious harm. So I must deny summary judgment as to Harris.

### 2. *Defendant Donohue-Gonzalez*

Azukas claims that Donohue-Gonzalez was deliberately indifferent to his serious medical needs by failing to have Azukas transported to the hospital on April 3, 2019. ECF No. 1 at 33;

ECF No. 8 at 6-7.  I conclude that there is a genuine dispute of fact as to both the objective and subjective prongs of this claim as well.

Donohue-Gonzalez does not dispute that Azukas was experiencing a serious medical condition when she examined him on April 3; she herself believed that Azukas had a concussion at that time and needed a CT scan.  ECF No. 64-1 ¶¶ 28, 31; ECF No. 70-2 at 15 ¶ 28, 16 ¶ 31. And the day after she saw him, Azukas was transported to the emergency room where, after assessing him, medical staff ordered a craniotomy to take place the following day.  ECF No. 70-2 at 47-48 ¶¶ 157-164.  So there is little question that Azukas's condition was "sufficiently serious" at the time of Donohue-Gonzalez's examination.  *See Burrell v. Quiros*, No. 3:21-cv-393 (KAD), 2023 WL 8527176, at *8 (D. Conn. Dec. 8, 2023) (holding Plaintiff's condition was "sufficiently serious" where, "[r]oughly 20 hours after seeing Defendant…Plaintiff's condition worsened to the point that he was exhibiting additional symptoms and was rushed to the hospital…where a CT scan revealed that Plaintiff had a subdural hematoma," for which he received emergency neurosurgery).

Donohue-Gonzalez contends that summary judgment is nonetheless warranted because she conducted "objective[ly] reasonable medical inquiries" in response to Azukas's symptoms and concerns and the occurrence of a "brief or reasonable delay in treatment…as a result of coordination or availability does not constitute deliberate difference."  ECF No. 64 at 39-41.  It is not clear, however, that her conduct was reasonable or that her failure to send him to the hospital was due to "coordination or availability."   Azukas has presented evidence that Donohue-Gonzalez had the authority to send him to the hospital for emergency treatment on April 3, but that she *chose* not to do so.  ECF No. 70-2 at 45 ¶¶ 138-140.  He further alleges that she ordered X-rays, rather than the CT scan she determined he needed and that, on the form requesting these

tests, she indicated that these tests were "non-priority" and listed his diagnosis as "confusion," rather than a concussion. *Id.* at 44-45 ¶¶ 132-136. These allegations create a genuine dispute of fact as to whether Donohue-Gonzalez ignored a serious risk in declining to send Azukas immediately to the hospital, despite being aware that he was suffering from an urgent medical condition.

### D. Qualified Immunity

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017) (citations and internal quotations omitted). The doctrine "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (internal quotation marks omitted).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Brown*, 865 F.3d at 190 (internal quotation marks and alterations omitted). "The objective reasonableness of an official's conduct is a mixed question of law and fact." *Nazario v. Thibeault*, No. 3:21-cv-216 (VLB), 2022 WL 2358504, at *8 (D. Conn. June 30, 2022) (quoting *Taravella v. Town of Wolcott,* 599 F.3d 129, 133 (2d Cir. 2010)) (internal quotation marks and alterations omitted). Thus, "[a]lthough qualified immunity is a question of law, because [the] issue of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted." *Maye v. Vargas*, 638 F. Supp. 2d 256, 262 (D. Conn. 2009)).

Harris and Donohue-Gonzalez contend that it was objectively reasonable for them to believe that the courses of treatment they pursued did not violate Azukas's Eighth Amendment rights.  ECF No. 57-1 at 32; ECF No. 64 at 52-54.  But Azukas has alleged that they downplayed his symptoms and responded as if he had a minor scrape instead of a worsening head trauma despite their awareness that he faced a growing risk of harm.  *See Burrell,* 2023 WL 8527176, at *11 (explaining that it was clearly established that "a medical professional's allegedly cursory and apathetic evaluation of a patient, dismissive consideration of the patient's self-reported pain and other serious symptoms, and choice of a less effective treatment possibly based on considerations other than sound medical judgment[ ]could constitute deliberate indifference to a serious medical condition in violation of the Eighth Amendment").  Azukas has also presented evidence that both medical professionals and laypersons were concerned by the delays in treatment and quality of care he received.  For example, C.O. Steiner was "surprised" and did not think it was "right" that Harris sent Azukas back to his cell on April 2.  ECF No. 70-39 ¶ 21.  And, according to Azukas, Dr. Cartwright was visibly upset by the fact that he had not yet been seen by a doctor on April 4.  ECF No. 70-2 at 46 ¶¶ 147-148.  These and other disputed facts bear on the reasonableness of Harris and Donohue-Gonzalez's conduct.  *See Burrell,* 2023 WL 8527176, at *11 ("Summary judgment is improper at this time with respect to the objective legal reasonableness of Defendant's actions, for many of the same reasons that summary judgment is improper with respect to Defendant's conscious disregard of a substantial risk of serious harm to Plaintiff's health.").  Accordingly, I decline to grant summary judgment as to the issue of qualified immunity.

## V.        CONCLUSION

For the reasons explained above, the motions for summary judgment are granted as to Defendant Semple and denied as to Defendants Harris and Donohue-Gonzalez. Azukas's claim against Semple is dismissed with prejudice, and the Clerk is directed to terminate Semple as a defendant.

IT IS SO ORDERED.

/s/

Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
          September 18, 2024